IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

| | |
|---|---|
| FREEDOM COALITION OF DOCTORS FOR CHOICE, | |
| Plaintiff, | |
| v. | Civil Action No. 2:23-CV-00102-Z |
| CENTERS FOR DISEASE CONTROL AND PREVENTION, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendants. | |


**CONSOLDIDATED BRIEF IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

Sarah E. Delaney
Assistant United States Attorney
Arizona Bar No. 031722
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8730
Facsimile:   214-659-8807
sarah.delaney@usdoj.gov

Attorneys for Defendants

## Table of Contents

I.  Summary .......................................................................................................... 1

II.  Background ................................................................................................... 3

    A.  CDC's V-safe Program ............................................................... 3

    B.  V-Safe Data ................................................................................. 4

    C.  Plaintiff's FOIA Request ............................................................ 6

III.  Legal Standards .......................................................................................... 8

    A.  The Freedom of Information Act ................................................ 8

    B.  Summary Judgment in FOIA Cases .......................................... 9

IV.  Argument and Authorities ........................................................................ 10

    A.  It is undisputed that the CDC conducted an adequate search. ................... 10

    B.  CDC properly withheld the Free-Text Responses pursuant to
           Exemption 6. .............................................................................. 14

         1.  The data files with the Free-Text Responses contain
             information exempt from disclosure under Exemption 6. .............. 14

         2.  The non-exempt portions of the Free-text Responses are not
             reasonably segregable. ................................................................. 22

         3.  Plaintiff's arguments that CDC has multiple available options
             for processing its FOIA request are inaccurate. ............................ 28

    C.  Plaintiff's remaining claims fail, and Defendants are entitled to
           summary judgment in their favor as to both claims. .................. 33

         1.  Plaintiff is not entitled to any relief regarding its claims that
             Defendants failed to timely respond to its administrative
             appeals. ....................................................................................... 33

         2.  CDC properly denied Plaintiff's request for a fee waiver. .............. 35

V.  Conclusion ................................................................................................. 39

# Table of Authorities

## Cases

*Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Comm.*,
  907 F.2d 203 (D.C. Cir. 1990) ................................................................. 24, 36

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
  641 F.3d 504 (D.C. Cir. 2011) ..................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................ 9

*Armstrong v. Exec. Office of the President*,
  97 F.3d 575 (D.C. Cir. 1996) ...................................................................... 23

*Ayuda v. Federal Trade Commission*,
  70 F. Supp. 3d 247 (D.D.C. 2014) ................................................... 25, 26, 28

*Baldwin v. U.S. Dep't of Energy*,
  No. 1:18-CV-1872, 2020 WL 376563 (D.D.C. Jan. 23, 2020) .................... 17

*Batton v. Evers*,
  598 F.3d 169 (5th Cir. 2010) .................................................................. 11, 12

*Calle v. FBI*,
  No. 3:10-CV-2362-M, 2011 WL 3820577 (N.D. Tex. Aug. 5, 2011) ......... 15

*Carney v. U.S. Dep't of Justice*,
  19 F.3d 807 (2d Cir. 1994) ......................................................................... 37

*Cause of Action v. FTC*,
  799 F.3d 1108 (D.C. Cir. 2015) ....................................................... 37, 38, 39

*CIA v. Sims*,
  471 U.S. 159 (1985) ....................................................................................... 9

*Citizens for Responsibility & Ethics in Washington v. FEC*,
  711 F.3d 180 (D.C. Cir. 2013) .................................................................... 35

*Coleman v. DEA*,
  714 F.3d 816 (4th Cir. 2013) ................................................................. 34, 36

*Cook v. Nat'l Archives & Records Admin.*,
  758 F.3d 168 (2d Cir. 2014) ....................................................................... 16

*Cooper Cameron Corp. v. U.S. Dep't of Labor*,
    280 F.3d 539 (5th Cir. 2002) .................................................................. 9, 10

*Ctr. for Immigr. Studies v. U.S. Citizenship & Immigr. Servs.*,
    628 F. Supp. 3d 266 (D.D.C. 2022) .......................................................... 23, 28

*DiBacco v. U.S. Army*,
    795 F.3d 178 (D.C. Cir. 2015) ...................................................................... 11

*Driggers v. United States*,
    No. 3:11-CV-0229-N, 2011 WL 5525337 (N.D. Tex. Oct. 26, 2011) ........................ 23

*Eakin v. U.S. Dep't of Defense*,
    No. 5:16-CV-972, 2017 WL 3301733 (W.D. Tex. Aug. 2, 2017) ................................ 9

*Elec. Privacy Info. Ctr. v. DHS*,
    384 F. Supp. 2d 100 (D.D.C. 2005) ............................................................... 19

*FBI v. Abramson*,
    456 U.S. 615 (1982) ............................................................................. 8, 9

*Freedom Watch, Inc. v. NSA*,
    783 F.3d 1340 (D.C. Cir. 2015) ..................................................................... 12

*Ground Saucer Watch, Inc. v. CIA*,
    692 F.2d 770 (D.C. Cir. 1981) ...................................................................... 12

*Hainey v. U.S. Dep't of Interior*,
    925 F. Supp.2d 34 (D.D.C. 2013) .............................................................. 25, 35

*Halloran v. Veterans Admin.*,
    874 F.2d 315 (5th Cir. 1989) ............................................................. 14, 15, 20

*Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*,
    608 F.2d 1381 (D.C. Cir. 1979) ..................................................................... 10

*Highland Cap. Mgmt., LP v. IRS*,
    408 F. Supp. 3d 789 (N.D. Tex. 2019) ............................................................. 17

*Hildenbrand v. Fahey*,
    No. 3:12-CV-2959-D, 2012 WL 5844185 (N.D. Tex. Nov. 16, 2012) ......................... 11

*Hildenbrand v. U.S. Dep't of Just.*,
    No. 3:11-CV-1829-N, 2012 WL 13103204 (N.D. Tex. Aug. 21, 2012) ....................... 10

*Hodge v. FBI,*
    703 F.3d 575 (D.C. Cir. 2013) ............................................................. 23

*Hornbostel v. U.S. Dep't of Interior,*
    305 F. Supp. 2d 21 (D.D. C. 2003) .................................................... 11

*In re Wade,*
    969 F.2d 241 (7th Cir. 1992) .............................................................. 11

*Inst. for Just. v. IRS,*
    941 F.3d 567 (D.C. Cir. 2019) ....................................................... 23, 24

*Int'l Counsel Bureau v. U.S. Dep't of Def.,*
    723 F. Supp. 2d 54 (D.D.C. 2010) .................................................... 27

*John Doe Agency v. John Doe Corp.,*
    493 U.S. 146 (1989) ........................................................................ 8, 9

*Jud. Watch v. U.S. Dep't of Def.,*
    715 F.3d 937 (D.C. Cir. 2013) ........................................................... 10

*Larson v. CIA,*
    843 F.2d 1481 (D.C. Cir. 1988) ................................................... 37, 39

*Lewis v. U.S. Dep't of Just.,*
    867 F. Supp. 2d 1 (D.D.C. 2011) ...................................................... 16

*Long v. Off. of Pers. Mgmt.,*
    692 F.3d 185 (2d Cir. 2012) ....................................................... passim

*Martin v. U.S. Dep't of Just.,*
    488 F.3d 446 (D.C. Cir. 2007) ............................................................ 9

*McQueen v. United States,*
    264 F. Supp. 2d 502 (S.D. Tex. 2003) .............................................. 37

*Nat'l Archives & Records Admin. v. Favish,*
    541 U.S. 157 (2004) ........................................................................... 16

*Nat'l Ass'n of Home Builders v. Norton,*
    309 F.3d 26 (D.C. Cir. 2002) ....................................................... 18, 20

*Nat'l Ass'n of Retired Fed. Emps. v. Horner,*
    879 F.2d 873 (D.C. Cir. 1989) ..................................................... 14, 18

*Nat'l Sec. Counselors v. U.S. Dep't of Justice,*
    848 F.3d 467 (D.C. Cir. 2017) ....................................................37, 38, 39

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't,*
    No. 16-CV-387, 2017 WL 1494513 (S.D.N.Y. Apr. 19, 2017) ..............................24, 28

*Navigators Ins. Co. v. Dep't of Justice,*
    155 F. Supp. 3d 157 (D. Conn. 2016)....................................................35

*Niskanen Ctr. v. Fed. Energy Regulatory Comm'n,*
    20 F.4th 787 (D.C. Cir. 2021)....................................................19

*Patterson v. IRS,*
    56 F.3d 832 (7th Cir. 1995) ....................................................12

*Payne v. Dep't of Justice,*
    121 F.3d 704, 1997 WL 450139 (5th Cir. 1997) ....................................................12

*Prison Legal News v. Samuels,*
    787 F.3d 1142 (D.C. Cir. 2015) ....................................................16

*Reporters Comm. for Freedom of Press v. FBI,*
    877 F.3d 399 (D.C. Cir. 2017) ....................................................11

*Rojas v. FAA,*
    941 F.3d 392 (9th Cir. 2019) ....................................................17

*Rural Hous. All. v. U.S. Dep't of Agric.,*
    498 F.2d 73 (D.C. Cir. 1974) ....................................................20

*Salas v. Off. of Inspector Gen.,*
    577 F. Supp. 2d 105 (D.D. C. 2008) ....................................................16, 21

*Schrecker v. U.S. Dep't of Just.,*
    349 F.3d 657 (D.C. Cir. 2003)....................................................24

*Seife v. U.S. Dep't of State,*
    298 F. Supp. 3d 592 (S.D.N.Y. 2018) ....................................................17

*Shapiro v. U.S. Soc. Sec. Admin,*
    525 F. Supp. 3d 528 (D. Vt. 2021) ....................................................24, 28

*Sherman v. U.S. Dep't of the Army,*
    244 F.3d 357 (5th Cir. 2001) ....................................................18, 21

*Solar Sources, Inc. v. United States,*
   142 F.3d 1033 (7th Cir. 1998) ............................................................. 24

*Thompson v. Exec. Office for U.S. Attorneys,*
   587 F. Supp. 2d 202 (D.D.C. 2008) ..................................................... 23

*Tijerina v. Walters,*
   821 F.2d 789 (D.C. Cir. 1987) ............................................................ 34

*U.S. Dep't of Def. v. Fed. Labor Relations Auth.,*
   510 U.S. 487 (1994) ................................................................... 18, 19

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press,*
   489 U.S. 749 (1989) ............................................................ 15, 18, 21

*U.S. Dep't of State v. Ray,*
   502 U.S. 164 (1991) ................................................................... 21, 22

*U.S. Dep't of State v. Wash. Post Co.,*
   456 U.S. 595 (1982) ................................................................... 14, 16

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
   141 S. Ct. 777 (2021) ......................................................................... 8

*Velasquez v. Nielsen,*
   754 F. App'x 256 (5th Cir. 2018) ...................................................... 34

*Vietnam Veterans of Am. Conn. Greater Hartford Ch. 120 v. DHS,*
   8 F. Supp. 3d 188 (D. Conn. 2014) ............................................... 24, 28

*Voinche v. FBI,*
   999 F.2d 962 (5th Cir. 1993) ............................................................. 34

*Voinche v. U.S. Dep't of Air Force,*
   983 F.2d 667 (5th Cir. 1993) ............................................................. 36

*Weisberg v. U.S. Dep't of Justice,*
   705 F.2d 1344 (D.C. Cir. 1983) .......................................................... 11

*Wessler v. U.S. Dep't of Just.,*
   381 F. Supp. 3d 253 (S.D.N.Y. 2019) ................................................ 20

*Wilbur v. CIA,*
   355 F.3d 675 (D.C. Cir 2004) ....................................................... 12, 34

*Wolf v. CIA*,
  473 F.3d 370 (D.C. Cir. 2007) ................................................................. 10


**Statutes**

5 U.S.C. § 552(a)(4)(A) ............................................................................ 36

5 U.S.C. § 552(a)(4)(A)(iii) ...................................................................... 36

5 U.S.C. § 552(a)(4)(A)(vii) ..................................................................... 36

5 U.S.C. § 552(a)(6)(A) .............................................................................. 6

5 U.S.C. § 552(a)(6)(A)(ii) ....................................................................... 33

5 U.S.C. § 552(a)(6)(B)(i) ..................................................................... 7, 33

5 U.S.C. § 552(a)(6)(B)(iii) ........................................................................ 7

5 U.S.C. § 552(a)(6)(C) ............................................................................ 34

5 U.S.C. § 552(b) ................................................................................. 8, 22

5 U.S.C. § 552(b)(6) .................................................................... 2, 7, 14, 16


**Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 9


**Regulations**

45 C.F.R. § 5.63 .......................................................................................... 7


**Other Authorities**

Hervé, Caroline, *et al.*, *The how's and what's of vaccine reactogenicity*, NPJ Vaccines
  (Sept. 24, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6760227/. ............. 32

HHS, *About VAERS*, https://vaers.hhs.gov/about.html (last visited Nov. 6, 2023) ............ 3

Myers, Tanya, *et al., The v-safe after vaccination health checker: Active vaccine safety monitoring during CDC's COVID-19 pandemic* response, NIH (Jan. 23, 2023), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC9870038/ ..........................................3

# I.     Summary

This case presents a familiar issue: a Freedom of Information Act (FOIA) request that seeks an immense quantity of information exempt from disclosure under a FOIA exemption, and the processing of which would require a herculean effort from the target agency that is beyond what FOIA requires.

Plaintiff Freedom Coalition of Doctors for Choice (Doctors for Choice) spends most of its motion for summary judgment arguing about irrelevant issues in a FOIA lawsuit.  It raises concerns about the COVID-19 vaccine.  Doctors for Choice asserts its inherent distrust of Defendants the Centers for Disease Control and Prevention (CDC) and the U.S. Department of Health and Human Services (HHS).  Doctors for Choice inaccurately complains that Defendants have failed to respond to its administrative appeals.  (In actuality, the agencies *did* respond to the appeals before Plaintiff filed its summary-judgment motion.)  And Doctors for Choice claims it really, really wants the requested data and really, really believes it should not have to pay for it because it thinks Defendants "hid" the truth about the alleged-adverse effects of the COVID-19 vaccine and it claims it wants to share that truth with the public.

But courts have repeatedly explained that summary judgment in a FOIA lawsuit essentially boils down to only two questions:

> (1) did the agency perform an adequate search for records responsive to the FOIA request, and

> (2) did the records or information that the agency withheld from disclosure fall within a FOIA exemption?

If the agency demonstrates that the answer to both questions is yes, the agency should be

granted summary judgment in its favor.

Here, Doctors for Choice sought from CDC the free-text field responses submitted to the "V-safe" program—a smartphone-based program that uses periodic surveys to monitor the health of voluntary participants following COVID-19 vaccination. In response, CDC provided Plaintiff with all the publicly available information from the program, with data collected from millions of V-safe participants.

But the agency withheld from disclosure the specific "free-text" responses to questions on V-safe's health surveys, pursuant to a FOIA exemption that protects information implicating a personal privacy interest from unwarranted disclosure. *See* 5 U.S.C. § 552(b)(6). CDC determined that many of these responses contain personal identifiable information, the disclosure of which would publicly link participants to highly sensitive health information. And because it would take tens of thousands of workhours to manually review and redact millions of free-text responses, CDC determined that segregating the non-exempt information within these responses would be unreasonably burdensome and was therefore beyond its FOIA obligations.

That determination is justified under the FOIA and supported by the record, and CDC complied with its search obligations—the two necessary requirements for summary judgment in an agency's favor. Moreover, Doctors for Choice's claims that CDC and HHS never responded to its administrative appeals are false, its claims that they did not timely respond are in part false, and none of these claims entitle Doctors for Choice to any kind of relief. And as for Doctors for Choice's claim that its fee waiver should not have been denied, it failed to demonstrate that it met the necessary criteria to be eligible

for the waiver, and it was never actually charged any fees, meaning the claim is moot.

For these reasons, and as explained below, the Court should grant summary judgment in Defendants' favor, deny Plaintiff's summary-judgment motion, and enter final judgment for Defendants dismissing all of Plaintiff's claims with prejudice.

## II.     Background

### A.     CDC's V-safe Program

HHS has monitored the safety of vaccines licensed or otherwise authorized for use in the United States for decades.  *See* HHS, *About VAERS*, https://vaers.hhs.gov/about.html (last visited Nov. 6, 2023).  HHS's vaccine safety monitoring plays a critical function in ensuring that accurate and timely information regarding vaccine safety is communicated to public health officials, healthcare providers, and the public.  *See* Myers, Tanya, *et al.*, *The v-safe after vaccination health checker: Active vaccine safety monitoring during CDC's COVID-19 pandemic response*, NIH (Jan. 23, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9870038/.

In 2020, during the COVID-19 pandemic, HHS determined that it was necessary to supplement its existing vaccine safety surveillance efforts with a new program designed for real-time safety monitoring for COVID-19 vaccines.  *Id.*  CDC rolled out this new surveillance program—called "V-safe"—in December 2020, in preparation for the initial distribution of COVID-19 vaccines in the United States.  *Id.*

V-safe employs a smartphone-based application that allows participants who received a COVID-19 vaccine dose to voluntarily enroll and report their (or a

dependent's) health after vaccination in daily, weekly, and monthly intervals.  (App.[1] 3 ¶ 10.)  A participant enrolls in V-safe by entering basic personal information (*e.g.*, name, mobile number, date of birth, sex, zip code) and the vaccine dose(s) he or she has received.  (*Id.*)  Once a participant enrolls, the V-safe smartphone application will periodically send text messages to the participant that provide individualized links to web-based health check-in surveys.  (*Id.*)

V-safe asks participants to complete a health check-in survey (i) every day for the first week following vaccination; (ii) every week for the next five weeks; and (iii) at three, six, and twelve months after vaccination.  (*Id.*)  The health check-in surveys ask participants a series of questions regarding, among other things, the status of their health, any symptoms they are experiencing, and any medical care they have received.  (App. 3 ¶ 10, and 7 ¶ 16.)  Some questions provide pre-specified answer options—e.g., a participant can choose from a list of specific symptoms to answer, "*Have you experienced any of these symptoms today?*"  (App. 3 ¶ 10.)  And participants answer other questions by typing a response into a "free text" field.  (App. 3 ¶ 10, and 7 ¶ 16.)

Since V-safe's inception in December 2020, CDC has collected information from over 10.1 million V-safe participants.  (App. 3 ¶ 10 n.3.)

## B.    V-Safe Data

All data that participants submit to the V-safe smartphone application is initially

---

[1] "App.__" citations refer to the materials in the accompanying Appendix to Defendants' Cross-Motion for Summary Judgment.

collected and stored in a secure server maintained by a software company under a contract with HHS. (App. 4 ¶ 11.) For CDC to obtain the data stored on this server, the team within the CDC's National Center for Emerging and Zoonotic Infectious Diseases responsible for overseeing the CDC's "V-safe program" (the "V-safe Safety Team") must download data files from the company's secure cloud location onto a server maintained by the agency. (*Id.*)

Each workday, the team downloads the following files of data newly submitted to the V-safe smartphone application: (i) registration data; (ii) vaccination data; (iii) data derived from the health check-in surveys for participants 3 years of age and older; (iv) data derived from the health check-in surveys for participants younger than 3 years of age; and (v) race/ethnicity data. (*Id.*) Then, each Monday, the prior week's daily data files are added to the agency's corresponding files containing the cumulative data that CDC has collected through the V-safe smartphone application since December 2020 (e.g., the daily files of vaccination data are added to the file with the cumulative vaccination data). (*Id.*) The daily and cumulative data files are maintained exclusively by the V-safe Safety Team, and only a small group of CDC staff (all of whom work on the V-safe Safety Team) has authorization to access these files. (App. 4 ¶ 11, and 6 ¶ 13.)

CDC has also publicly released a sizable amount of the data collected through the V-safe smartphone application, including the registrant codes for all V-safe participants. (App. 5 ¶ 12.) This public release does not include any PII and thus does not include the Free-Text Responses from the health check-in surveys data files. (App. 5–6 ¶¶ 12–13.)

**C.      Plaintiff's FOIA Request**

On January 3, 2023, CDC received a FOIA request from Doctors for Choice,

seeking "[a]ll data obtained from v-safe users/registrants from the free text fields within

the v-safe program for COVID-19 vaccines and the registrant code associated with each

free text field/entry" from October 1, 2020, through December 31, 2022.  (App. 2 ¶ 5, and

20–25.)  Doctors for Choice also requested expediting processing of its FOIA request and

a fee waiver.  (*Id.*)

The following day, CDC sent a letter to Doctors for Choice acknowledging receipt

of the request.  (App. 2 ¶ 6; and 27–28.)  CDC informed Plaintiff that the agency would

be unable to issue a final determination within 20 days of receiving the request, *see* 5

U.S.C. § 552(a)(6)(A), and invited Doctors for Choice to narrow the scope of the records

requested.  (App. 27.)  CDC also explained that as Doctors for Choice (1) had not

demonstrated there was an imminent threat to the life or physical safety of an individual

and (2) had not demonstrated it was a person primarily engaged in disseminating

information, its request for expedited processing was denied.  (App. 2 ¶ 6, and 27.)

Finally, CDC explained that Doctors for Choice was entitled to two free hours of search

time and up to 100 pages of duplication without charge, but its fee waiver was denied

because Plaintiff (1) had not demonstrated that it disseminated information to the public

and (2) had not provided enough information to warrant a waiver of fees.  (App. 2 ¶ 6,

and 27–28.)

On January 12, 2023, CDC issued a final determination on Doctors for Choice's

FOIA request, producing all responsive records that were not otherwise exempt from

production under one of the FOIA exemptions—including Doctors for Choice's request for the registrant codes for all V-safe participants.  (App. 2 ¶ 7, 6 ¶ 13, and 30–31.)  CDC did explain, however, that it was withholding the V-safe free-text fields responses ("Free-Text Responses") as there were more than 7.8 million Free-Text Responses collected, and those entries contained personal identifiable information (PII) which would be unreasonably burdensome for CDC to manually review and redact.[2]  (App. 2 ¶ 7, and 30.)

On January 13, 2023, Doctors for Choice appealed CDC's decision to HHS. (App. 3 ¶ 8, and 33–48.)  HHS acknowledged receipt of this appeal on January 17, 2023. (App. 3 ¶ 8, and 50.)  In its acknowledgement letter, HHS explained that Plaintiff's appeal would require consultation with another office or agency with substantial interest in the appeal, meaning it fell within the definition of "unusual circumstances" necessitating an extension of the standard time period for processing FOIA appeals, *see* 5 U.S.C. §§ 552(a)(6)(B)(i), (iii).  (*Id*.)  On July 5, 2023, HHS sent a letter dated July 3, 2023 to Plaintiff that its appeal was administratively closed in accordance with 45 C.F.R. § 5.63 due to the commencement of this instant action.  (App. 3 ¶ 8, and 52–53.)

On March 31, 2023, Plaintiff appealed CDC's denial of the fee waiver to HHS. (App. 3 ¶ 9, and 55–146.)  On April 12, 2023, HHS notified Plaintiff that it had received the appeal, but the appeal was administratively closed as moot because no fees arose

---

[2] Although the CDC's determination did not explicitly cite to FOIA Exemption 6 as the statutory basis for withholding these records, the agency's explanation demonstrated that this exemption applied to the free-text field responses.  *See* 5 U.S.C. § 552(b)(6) (explaining that the requirements for production of records under FOIA "does not apply to matters that are personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy").

from Plaintiff's FOIA request.  (App. 3 ¶ 9; and 148, 150.)  This letter was re-sent to Plaintiff on July 3, 2023, as the email address provided by the Plaintiff would not allow the original message to be delivered.  (App. 3 ¶ 9; and 152–54.)

On June 16, 2023, Plaintiff filed this action under the FOIA, seeking to compel CDC to produce non-exempt records responsive to its FOIA request and to enjoin CDC from charging Doctors for Choice any fees in conjunction with the FOIA request.  (*See generally* Doc. 1.)  On July 11, 2023, Doctors for Choice filed its motion for summary judgment.  (*See generally* Doc. 8 (motion); Doc. 9 (brief in support).)  After Defendants' motion to dismiss was denied (Doc. 23), Defendants answered the complaint on November 17, 2023.  (Doc. 26.)  Defendants now respond to Plaintiff's summary-judgment motion and file their own cross-motion for summary judgment as to all claims and causes of actions asserted by Plaintiff.

### III.      Legal Standards

### A.      The Freedom of Information Act

The FOIA represents a "workable balance" struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted).  To that end, the "FOIA mandates the disclosure of documents held by a federal agency," *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021), unless the documents fall within one of nine exemptions enumerated in 5 U.S.C. § 552(b), "under which disclosure could be refused," *FBI v. Abramson*, 456 U.S. 615, 621 (1982).  Therefore, while the FOIA's "dominant objective" is public disclosure, *John*

*Doe Agency*, 493 U.S. at 152, "the public's right to information" under the statute is "not absolute," *Martin v. U.S. Dep't of Just.*, 488 F.3d 446, 453 (D.C. Cir. 2007).[3]

The FOIA's exemptions reflect Congress's recognition "that legitimate governmental and private interests could be harmed by release of certain types of information." *John Doe Agency*, 493 U.S. at 152; *accord CIA v. Sims*, 471 U.S. 159, 166–67 (1985) ("[P]ublic disclosure is not always in the public interest . . . ."). And although these exemptions should be "narrowly construed," *Abramson*, 456 U.S. at 630, a court should also ensure that exemptions are given a "meaningful reach and application," *John Doe Agency*, 493 U.S. at 152.

## B.    Summary Judgment in FOIA Cases

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "FOIA cases typically and appropriately are decided on motions for summary judgment."  *Eakin v. U.S. Dep't of Defense*, No. 5:16-CV-972, 2017 WL 3301733, at *3 (W.D. Tex. Aug. 2, 2017).

Generally, to prevail on summary judgment in the FOIA context, an agency bears the burden of showing that

    (1) it conducted an adequate search for records responsive to a
        request, and

---

[3] Courts in the Fifth Circuit frequently rely on FOIA precedent from the D.C. Circuit, "the federal appellate court with the most experience in this field."  *Cooper Cameron Corp. v. U.S. Dep't of Labor*, 280 F.3d 539, 543 (5th Cir. 2002).

(2) that any records or information that the agency withheld from
disclosure fall within a FOIA exemption.

*See, e.g.*, *Hildenbrand v. U.S. Dep't of Just.*, No. 3:11-CV-1829-N, 2012 WL 13103204,
at *5 (N.D. Tex. Aug. 21, 2012) ("*Hildenbrand I*"); *see also Cooper Cameron Corp.*, 280
F.3d at 543 (same).

  An agency's declaration typically carries its burden on summary judgment to
demonstrate the adequacy of its search and to prove the applicability of any claimed
exemptions. *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 190–91 (2d Cir. 2012). A
reviewing court should accord an agency's declaration "substantial weight," *Hayden v.
Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), as these
declarations are "entitled to a 'presumption of legitimacy,'" *Hildenbrand I*, 2012 WL
13103204, at *6. "[S]ummary judgment is warranted on the basis of agency"
declarations when they describe the scope and method of the search and "the
justifications for nondisclosure with reasonably specific detail and are not controverted
by either contrary evidence in the record nor by evidence of agency bad faith." *Wolf v.
CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citation omitted). "Ultimately, an agency's
justification for invoking a FOIA exemption is sufficient if it appears 'logical' or
'plausible.'" *Jud. Watch v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013)
(citation omitted).

## IV. Argument and Authorities

### A. It is undisputed that the CDC conducted an adequate search.

  CDC's search for records responsive to Doctors for Choice's request satisfied its

obligations under the FOIA, which Doctors for Choice does not meaningfully contest. (Doc. 9, at 27–32 (arguing solely that the CDC is improperly withholding responsive records under a FOIA exemption).)  An agency can demonstrate it fulfilled its obligations under FOIA if it can demonstrate "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  In other words, an agency should be granted summary judgment on search adequacy if it shows that it made "a good faith effort to conduct a search" using methods that "can be reasonably expected to produce the information requested." *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015) (citation omitted).  The focus of this inquiry is on the "reasonableness" of the search process—"not on the results." *Hornbostel v. U.S. Dep't of Interior*, 305 F. Supp. 2d 21, 26 (D.D.C. 2003), *aff'd*, No. 03-5257, 2004 WL 1900562 (D.C. Cir. Aug. 25, 2004).

To meet this standard, an agency need not "be exhaustive" or "search every record system." *Hildenbrand v. Fahey*, No. 3:12-CV-2959-D, 2012 WL 5844185, at *3 (N.D. Tex. Nov. 16, 2012) (citations omitted).  It simply must conduct a good-faith, reasonable search of those record systems likely to possess the requested records.  *See Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017).  The issue to be resolved is whether the search methods were reasonable, not whether other documents might exist that were not located.  *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010) (citing *In re Wade*, 969 F.2d 241, 249 n.11 (7th Cir. 1992)).  In short, a "search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *DiBacco*, 795 F.3d at 194–95 (citation omitted); *see also*

*Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (assessing adequacy "by the appropriateness of the methods used to carry out the search").

An agency establishes the reasonableness of its search if the agency provides "reasonably detailed, nonconclusory affidavits [or declaration(s)] describing its efforts." *Freedom Watch, Inc. v. NSA*, 783 F.3d 1340, 1345 (D.C. Cir. 2015) (citation omitted). "An agency may establish reasonableness through affidavits that provide a reasonably detailed and non-conclusional description of the agency's search methods." *Payne v. Dep't of Justice*, 121 F.3d 704, 1997 WL 450139, at *1 (5th Cir. 1997) (citing *Patterson v. IRS*, 56 F.3d 832, 836 (7th Cir. 1995)).

"[I]n analyzing the affidavits and declarations submitted by the government," the agency's affidavit or declaration "is entitled to a 'presumption of legitimacy' unless there is evidence of bad faith in handling the FOIA request," *Batton*, 598 F.3d at 176, "which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents,'" *Payne*, 1997 WL 450139, at *2 (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)); *accord Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir 2004) ("[M]ere speculation" that other "documents might exist[] does not undermine the determination that the agency conducted an adequate search for the requested records.").

In this case, Doctors for Choice does not dispute that CDC's search was adequate. (*See* Doc. 9, at 27–31.)  Instead, the parties just disagree about whether specific fields within those records should be produced or are exempted from disclosure.  In other

words, it is undisputed that the CDC's good-faith search was reasonably calculated to uncover all records responsive to Plaintiff's request for all data submitted to V-safe in the free-text fields between October 1, 2020 and December 31, 2022 and the related registrant codes.

The agency has explained its search methods in a detailed and nonconclusory manner. Roger Andoh is the FOIA Officer for CDC who crafted the search methods and supervised CDC's search for responsive documents and information. Andoh determined that—based on the information specifically sought by Doctors for Choice's FOIA requests (free text response fields)—the data was likely held at only two potential locations: (1) the team within CDC's National Center for Emerging and Zoonotic Infectious Diseases responsible for overseeing CDC's "V-safe program" (the "V-safe Safety Team") or (2) the server that hosts the V-safe data previously made publicly available. (App. 6 ¶ 13.) Therefore, CDC's FOIA Office produced a link to Plaintiff to download a copy of the public V-safe data, including the registrant codes. (App. 6 ¶ 14.)

The only place where the parties disagree is that the CDC's FOIA Office also determined that the 7.8 million Free-Text Responses from the health check-in surveys data files should be withheld under Exemption 6 of the FOIA as they contain PII, as explained in greater detail below. (App. 6 ¶ 15.)

Accordingly, as the agency's declaration explains, CDC's search was reasonably calculated to locate all responsive records. The Court, therefore, need not assess the adequacy of the search because the V-safe data is a confined universe, which has been made publicly available and produced to Plaintiff—except for the Free-Text Responses

fields, as explained further below.

**B.      CDC properly withheld the Free-Text Responses pursuant to Exemption 6.**

CDC's withholding of the Free-Text Responses from the health check-in surveys data files pursuant to Exemption 6 is justified under FOIA and supported by the record. Many of the Free-Text Responses contain personal identifiable information that, if disclosed, would publicly link individual participants to their highly sensitive health information.  And because manually reviewing and redacting all 7.8 million responses would impose an unreasonable burden on the agency, CDC properly withheld the Free-Text Responses in full.

**1.      The data files with the Free-Text Responses contain information exempt from disclosure under Exemption 6.**

"One of the most important concerns counterbalancing the public's general interest in disclosure is the desire to protect individuals' privacy interests." *Halloran v. Veterans Admin.*, 874 F.2d 315, 318 (5th Cir. 1989).  As a result, several FOIA exemption—including Exemption 6—refer explicitly to "privacy." *Id.*  Exemption 6 permits an agency to withhold from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The purpose of this exemption is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982). To that end, Congress designed Exemption 6 to broadly "protect personal information in public records, even if it is not [itself] embarrassing or of an intimate nature." *Nat'l*

*Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989).  As a result, Exemption 6 "is not only intended to include medical and personnel files, but also *all private or personal information contained in other files*," if publicly disclosing that information would be a "clearly unwarranted invasion of the [individual's] privacy." *Calle v. FBI*, No. 3:10-CV-2362-M, 2011 WL 3820577, at *5 (N.D. Tex. Aug. 5, 2011).

     In deciding whether this exemption applies, courts apply a balancing test, weighing the public's right to information and the privacy issues enumerated in the specific FOIA exemption.  The first step is to identify and evaluate the specific privacy interests implicated by the information encompassed by the disclosure request.  *Halloran*, 874 F.2d at 319 (citing *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762–69 (1989)).  The government is not required to "detail the precise harm which disclosure would inflict upon the privacy interests of each individual," but instead must "only show that release of the information 'could reasonably' result in an unwarranted invasion of privacy." *Id.* at 320.  The second step is "to identify and evaluate the particular public interests that may be served—or disserved—by disclosure of the information." *Halloran*, 874 F.2d at 319 (citing *Reporters Comm.*, 489 U.S. at 769–75).  This inquiry "must focus solely upon whether disclosure of the identifying information . . . fosters the public's legitimate interest in the affairs of government"; a litigant's *personal* interest is "irrelevant." *Id.* at 323.  Once the privacy interests and public interests are identified, the court then weighs the interests for and against disclosure. *See id*. at 319.

     If (as here) a FOIA request implicates personal privacy interests of third-party

individuals, then the burden falls upon "the requester[] . . . to articulate a public interest

sufficient to outweigh an individual's privacy interest, and the public interest must be

significant." *Salas v. Off. of Inspector Gen.*, 577 F. Supp. 2d 105, 112 (D.D.C. 2008)

(citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

> ### a.     The data files containing the Free-Text Responses meet the definition of "similar files" under Exemption 6.

As a threshold matter, it is undisputed that the requested free-text responses

constitute "personnel," "medical," or "*similar files* the disclosure of which would

constitute" an invasion of privacy.  *See* 5 U.S.C. § 552(b)(6) (emphasis added); Doc. 9, at

28 ("Plaintiff certainly understands that the free-text fields will need to be reviewed for

PII . . . .").  The Supreme Court has interpreted that statutory term broadly to include any

government "records on an individual which can be identified as applying to that

individual." *Wash. Post Co.*, 456 U.S. at 602.  And it "covers not just files," but also

encompasses "bits of personal information" that refer to a particular individual, *Prison

Legal News v. Samuels,* 787 F.3d 1142, 1147 (D.C. Cir. 2015) (citation omitted), like "a

person's name, address, place of birth, employment history, and telephone number,"

*Lewis v. U.S. Dep't of Just.*, 867 F. Supp. 2d 1, 17 (D.D.C. 2011); *accord Cook v. Nat'l

Archives & Records Admin.*, 758 F.3d 168, 175 (2d Cir. 2014) ("[A] record is a 'similar

file' if it contains personal information identifiable to a particular person.").

As CDC explains, many of the Free-Text Responses contain detailed personal

information of V-safe participants.  (App. 8 ¶¶ 18–19.)  Although the health check-in

survey questions that elicited these responses asked about participants' health status,

symptoms, and medical care, and did not specifically ask participants to provide their personal information, many participants used the available free-text fields to provide CDC with such information.  (App. 7–9 ¶¶ 16–19.)

A random sample of 500 Free-Text Responses revealed dozens of responses containing, among other personal information, participants' full names, dates of birth, social security numbers, and telephone numbers—*i.e.*, bits of information that directly identify a particular participant.  (App. 8 ¶ 19.)  A similar random search of 500,000 Free-Text Responses found even more types of personal information contained within the responses, including V-safe participants' home addresses, email addresses, and decedents' names.  (*Id.*)  Based on the results of these random samples, as well as the V-safe Safety Team's familiarity with the health check-in surveys data files, CDC estimates that many of Free-Text Responses contain the same or similar forms of PII.  (App. 9 ¶ 20.)  Therefore, the data files containing the Free-Text Responses unquestionably qualify as "similar files" under Exemption 6.  *See, e.g.*, *Rojas v. FAA*, 941 F.3d 392, 405 (9th Cir. 2019) (concluding that "government records containing personal email addresses constitute 'similar files'" under Exemption 6; *Baldwin v. U.S. Dep't of Energy*, No. 1:18-CV-1872, 2020 WL 376563, at *4–5 (D.D.C. Jan. 23, 2020) (applying the exemption to mobile phone numbers); *Highland Cap. Mgmt., LP v. IRS*, 408 F. Supp. 3d 789, 817 (N.D. Tex. 2019) (explaining that "the social security numbers of contractors . . ., their signatures, and the personal telephone number of one of the contractor's supervisors" constitute "similar files" under the exemption); *Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 623–24 (S.D.N.Y. 2018) (finding emails that contained individuals'

names and email addresses fell within the definition of "similar files").

### b.   There are substantial privacy interests at stake given the personal information in the Free-Text Responses.

The privacy interest protected by Exemption 6 "encompasses the individual's control of information concerning his or her person."  *U.S. Dep't of Def. v. Fed. Labor Relations Auth. (FLRA)*, 510 U.S. 487, 500 (1994) (cleaned up).  The privacy interest at stake in FOIA exemption analysis belongs to the individual, not the agency holding the information.  *Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 363 (5th Cir. 2001) (citing *Reporters Comm.*, 489 U.S. at 763–65).  Thus, the privacy interest inherent in the nondisclosure of certain information exists even where information may have become or may have been made public.  *See Reporters Comm.*, 489 U.S. at 770 (explaining the fact that "an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information"); *see also Sherman*, 244 F.3d at 363–64 (that private information may have been placed in public domain does not mean that a person irretrievably loses his privacy interest in the information).

It is self-evident that disclosure of V-safe participants' PII in the Free-Text Responses would compromise those participants' privacy interests.  As an initial matter, and setting aside everything else contained in the Free-Text Responses, courts have routinely found that publicly disclosing private individuals' names and addresses alone implicates substantial privacy interests.  *See, e.g.*, *FLRA,* 510 U.S. at 501; *Long*, 692 F.3d at 192; *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 35 (D.C. Cir. 2002); *Horner*, 879 F.2d at 875 ("[T]he privacy interest of an individual in avoiding the

unlimited disclosure of his or her name and address is significant.").  Indeed, the simple fact that disclosing individuals' names and contact information "might invite unwanted intrusions" or "contact or solicitation" is a risk to personal privacy sufficient to find the individuals' interests "substantial."  *Niskanen Ctr. v. Fed. Energy Regulatory Comm'n*, 20 F.4th 787, 791–92 (D.C. Cir. 2021) (collecting cases); *accord FLRA*, 510 U.S. at 500– 01 (finding a substantial privacy interest in personal addresses because "[m]any people simply do not want to be disturbed at home").

But the privacy interests implicated here are far more acute than the simple desire to be left alone.  As CDC explains, disclosing a V-safe participant's personal information through release of the Free-Text Responses would necessarily result in the publication of their highly sensitive health and medical information (which they reported to V-safe with the understanding that their identities would be held in confidence).  (App. 3 ¶ 10, and 9 ¶ 20.)  This consequence of disclosure is hardly speculative.  *See Elec. Privacy Info. Ctr. v. DHS*, 384 F. Supp. 2d 100, 116 (D.D.C. 2005) ("To justify their Exemption 6 withholdings," agencies "must show that the threat to [personal] privacy is real rather than speculative.").  Participants who used the free-text fields in the health check-in surveys to report PII along with their symptoms or any medical care they received would be connected to this sensitive health information based on information in the Free-Text Response alone.  (App. 7–9 ¶¶ 16–20.)

Moreover, each participant has a unique registration number that would be released with the Free-Text Responses (as part of the health check-in surveys data files). Any participant whose personal information is contained in a Free-Text Response would

therefore be easily traced to other health information that has been disclosed

anonymously in the already-published V-safe data files, which also include participants'

registration numbers.  (App. 6¶ 14.)  Indeed, even the mere fact that an individual is listed

as a participant in V-safe indicates his or her vaccination status.  (App. 3 ¶ 10.)

And depending on the content of a participant's health information, its disclosure and

connection to an individual could have far reaching consequences, including reputational

harms to the individual and his or her family and potentially his or her ability to obtain

insurance and employment.  Indeed, this type of concern was flagged by the Fifth Circuit

as a necessary consideration in FOIA exemption analysis.  *See Halloran*, 874 F.2d at 321.

As the *Halloran* court explained, it had "long been the rule" that the privacy concern was

not so much the identifying information itself, but rather "with the connection between

such information and some other detail—a statement, an event, or otherwise—which the

individual would not wish to be publicly disclosed."  *Id.*

It is virtually tautological to say that a person holds a significant privacy interest in

the "intimate details" concerning his or her "medical conditions."  *Rural Hous. All. v.

U.S. Dep't of Agric.*, 498 F.2d 73, 77 (D.C. Cir. 1974); *accord Wessler v. U.S. Dep't of

Just.*, 381 F. Supp. 3d 253, 258 (S.D.N.Y. 2019).  Courts have routinely found substantial

privacy interests in information that is far less sensitive in nature.  *See, e.g.*, *Norton*, 309

F.3d at 34–35 (finding that landowners had substantial privacy interests in parcel

numbers because their disclosure could lead to birdwatchers trespassing on their land).

The highly sensitive health information that would be publicly connected to a particular

V-safe participant if his or her personally identifiable information were disclosed with the

Free-Text Responses is exactly the type of information that is simply not intended to be "freely available to the public." *See Reporters Comm.*, 489 U.S. at 763–64. There is thus a substantial privacy interest in the nondisclosure of this personal information.

        c.      **Doctors for Choice cannot establish that the public interest in substantially outweighs the V-safe participants' substantial privacy interest.**

As for the second step of the FOIA exemption analysis balancing test, there is no conceivable public interest in the disclosure of V-safe participants' personal information—let alone a public interest "of such magnitude that it outweighs" the V-safe participants' "substantial privacy interest." *See Salas*, 577 F. Supp. 2d at 112. "The only public interest cognizable under" Exemption 6 "is the public 'understanding of the operations or activities of the government.'" *Long*, 692 F.3d at 193 (quoting *Reporters Comm.*, 489 U.S. at 775). "That interest is not implicated by disclosure of information about private citizens" in government files that "reveals little or nothing about an agency's own conduct." *Sherman*, 244 F.3d at 361.

In evaluating the public's interest in disclosure, "the professed intentions of the requestor are irrelevant." *Id.* at 362; *see also Reporters Comm.*, 489 U.S. at 771 ("[W]hether an invasion of privacy is *warranted* cannot turn on the purposes for which the request for information is made."). The question instead is whether the requested information sheds light on agency action, which must come "directly from disclosure." *Sherman*, 244 F.3d at 362. "Mere speculation about hypothetical public benefits [of disclosure] cannot outweigh a demonstrably significant invasion of privacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991).

But disclosure of V-safe participants' personally identifiable information—names, home addresses, telephone numbers, dates of birth—would tell the public "nothing about 'what the government is up to.'" *See Long*, 692 F.3d at 193.  And in any event, it is hard to imagine any cognizable public interest that could outweigh participants' substantial interests in keeping their highly sensitive health information private and in avoiding the consequences of this information's public disclosure. *See Ray*, 502 U.S. at 179.

Moreover, publicly disclosing V-safe participants' PII would not only further no public interest, but it would undermine the public's interest in the federal government's ability to monitor vaccine safety.  Although participants provided their personal and health information to CDC through V-safe, they did not consent to the public disclosure of their personal information.  On the contrary, V-safe informed participants that this information would remain confidential and private.  (App. 3 ¶ 10.)  If CDC were unable to ensure that participants' personal information would be kept confidential, it is likely that individuals would either not share sensitive information with V-safe or choose not to participate in the program altogether.  That, in turn, would frustrate the agency's COVID-19 vaccine safety monitoring efforts, which depend on CDC's ability to collect full, timely, and accurate information from vaccinated individuals.

### 2.     The non-exempt portions of the Free-text Responses are not reasonably segregable.

Under the FOIA, an agency must produce any "reasonably segregable portion of a record" that is otherwise withheld pursuant to an enumerated exemption.  5 U.S.C. § 552(b).  Like with its withholding decisions, an agency bears the burden of explaining

its decisions on segregability.  *See Driggers v. United States*, No. 3:11-CV-0229-N, 2011 WL 5525337, at *8 (N.D. Tex. Oct. 26, 2011) (report and recommendation), *adopted*, 2011 WL 5529801 (N.D. Tex. Nov. 14, 2011).  It can carry that burden by submitting a declaration that shows "with reasonable specificity" why documents withheld pursuant to a valid exemption "cannot be further segregated."  *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996); *see also Thompson v. Exec. Office for U.S. Attorneys*, 587 F. Supp. 2d 202, 207–08 (D.D.C. 2008) (explaining that when considering "whether nonexempt information could have been segregated from exempt information and released," a court may rely on an agency declaration if it "provides a sufficient description of the documents and a sufficient explanation of the basis for withholding"). The agency is "entitled to a presumption that it complied with the obligation to disclose reasonably segregable material," and the requestor can only rebut that presumption with "sufficient evidence" to the contrary.  *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013).

As CDC explains, the non-exempt information within the Free-Text Responses is not *reasonably* segregable, because having to review and redact 7.8 million Free-Text Responses to segregate non-exempt information would impose an unreasonable burden on the agency.  (App. 10–12 ¶¶ 22–29.)  FOIA "protects agencies from undue burdens" like this.  *Ctr. for Immigr. Studies v. U.S. Citizenship & Immigr. Servs.*, 628 F. Supp. 3d 266, 271 (D.D.C. 2022) (quoting *Inst. for Just. v. IRS*, 941 F.3d 567, 570 (D.C. Cir. 2019)).  That is because "[a]gencies respond to FOIA requests at taxpayer expense, and burdensome requests hinder an agency's ability to respond to other FOIA requests and to conduct its other statutory responsibilities."  *Id.* at 272; *see also Long*, 692 F.3d at 192

("FOIA does not require an agency to mobilize its full resources for compliance with FOIA requests.").

Courts therefore routinely acknowledge that an agency need not comply with a FOIA request that would "impose an unreasonable burden upon the agency." *Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Comm. (AFGE)*, 907 F.2d 203, 209 (D.C. Cir. 1990); *accord Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 664 (D.C. Cir. 2003) ("To require the Government to shoulder such a potentially onerous task . . . goes well beyond the 'reasonable effort' demanded in this context."). The FOIA statute "makes clear that courts should not order segregation when such a process would be significantly unwieldy." *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1039 (7th Cir. 1998).

This includes requests that would require overly burdensome post-search efforts, like having to "locate, review, redact, and arrange for inspection a vast quantity of material." *AFGE*, 907 F.2d at 209; *accord Inst. for Justice*, 941 F.3d at 570 (explaining that under FOIA, agencies are required to disclose all non-exempt data "subject, as always, to limits aimed at protecting agencies from undue burdens"); *Shapiro v. U.S. Soc. Sec. Admin*, 525 F. Supp. 3d 528, 539-40 (D. Vt. 2021) (finding FOIA request unduly burdensome as it would require line-by-line manual review of 1,581,644 pages to identify exempt information); *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, No. 16-CV-387, 2017 WL 1494513, at *14–15 (S.D.N.Y. Apr. 19, 2017) (finding agency demonstrated FOIA request was unduly burdensome as responsive records could number up to 1.3 million pages, and a review for redactions could take 436 to 1,300 weeks); *Vietnam Veterans of Am. Conn. Greater Hartford Ch. 120 v. DHS*, 8 F. Supp. 3d 188,

203–04 (D. Conn. 2014) (FOIA request for which agency would need to locate, review,

and make heavy redactions to 26,000 packets, each about 50 pages, was unduly

burdensome); *Hainey v. U.S. Dep't of Interior*, 925 F. Supp. 2d 34, 45 (D.D.C. 2013)

(holding it would be unreasonably burdensome to require agency to search and review

every email sent or received by 25 employees over a two-year period).

    This well-established principle was applied in *Ayuda, Inc. v. Federal Trade*

*Commission*, 70 F. Supp. 3d 247 (D.D.C. 2014), a case that bears a striking resemblance

to this one.   There, the plaintiff submitted multiple FOIA requests seeking information in

a Federal Trade Commission (FTC) database containing millions of consumer complaints

about alleged illegal business activity.  70 F. Supp. 3d at 254.  FTC's database (like the

V-safe database) contained data derived from both pre-specified and free-text fields.  *Id.*

Those free-text fields (like those at issue here) posed an issue: consumers could enter

personally identifiable information either about themselves or about an alleged

wrongdoer, even though the field in question did not ask for any such information.  *Id.* at

254–55.  Accordingly, FTC determined that the free-text fields within the database

contained (or could contain) information that was exempt from disclosure under, *inter*

*alia*, Exemption 6.  *Id.* at 261.  And because FTC would need to manually review and

redact millions of consumer complaints within the database to segregate non-exempt

information within the free-text fields—a task that FTC estimated would take more than

8,000 workhours—the agency determined that this part of the database was not

reasonably segregable.  *Id.* at 255.  On that issue, the court granted summary judgment in

favor of FTC.  *Id.* at 274–77.  The court found that having to expend 8,000 workhours to

"perform[] a manual review" of millions of complaints "to protect the privacy interests of third-party citizens by preventing the disclosure of their personal identifying information" "would impose an unreasonable burden on the FTC well beyond what FOIA requires." *Id.* at 276–77.  Accordingly, the court held that the agency properly withheld "the entire universe of information contained in the data fields," even though "only a small percentage of that information is exempt" under an enumerated exemption, "given the burden of removing the subset of exempt information."  *Id.* at 276.

So too here.  Requiring CDC to review and redact the enormous volume of information contained in the Free-Text Responses would impose an unreasonable burden on the agency that FOIA simply does not contemplate.  As CDC explains, there are 7.8 million Free-Text Responses within the health check-in surveys data files.  (App. 6 ¶ 15.) To process these responses, a FOIA analyst would need to conduct a manual, line-by-line review of each response to determine whether any information is personally identifiable or otherwise exempt from disclosure under Exemption 6, redacting any exempt information while ensuring that any non-exempt portions of the response are segregated. (App. 10 ¶ 23.)  This review process will also likely require that a FOIA analyst conduct research to determine whether the disclosure of certain types of information will interfere with a particular participant's personal privacy.  (App. 10–11 ¶¶ 23, 26.)  And pursuant to CDC's FOIA Office procedures, once this first level of review is complete, either a senior FOIA analyst or a Team Lead in the FOIA Office would have to conduct another manual, line-by-line review of each Free-Text Response to ensure that all redactions are accurate, consistent, comply with agency standards, and that all PII is redacted.  (App. 10 ¶ 24.)

Based on the amount of time it has taken a FOIA analyst to process similar records, as well as his experience and familiarity with processing records under FOIA, CDC's FOIA Director Roger Andoh estimates that, on average, a FOIA analyst dedicated solely to processing the Free-Text Responses would be able to process about 2,525 responses per 40-hour week.  (App. 10 ¶ 25.)  That means it would take a FOIA analyst about 123,564 workhours to complete just the first level of processing for all 7.8 million Free-Text Responses.  (App. 11 ¶ 26.)  Or in other words, if one FOIA analyst were assigned to process these responses full-time (i.e., 40 hours per week), it would likely take that analyst *over 59 years* to finish the first level of processing.  And that says nothing of the second level of review by a senior FOIA analyst or Team Lead, which will likewise take tens of thousands of workhours to complete.  (*Id.*)

Given the immense volume of Free-Text Responses and the considerable amount of time it would take to review them and redact the personally identifiable information of tens of thousands of V-safe participants, it is not reasonably possible for CDC to process them with the necessary redactions.  CDC's FOIA Office comprises thirteen FOIA analysts who are responsible for responding to all FOIA requests from receipt to completion of any administrative appeal, as well as assisting with any related litigation. (App. 12 ¶ 28.)  Even if CDC were to devote all thirteen analysts to work full-time on processing the Free-Text Responses, it would take the agency almost 4.5 years to complete the task.  (App. 12 ¶ 29.)  But that is not a viable option, as the FOIA Office cannot put all other requests, appeals, and related litigation tasks on hold for the sake of processing a single dataset in response to a single FOIA request.  *See, e.g., Int'l Counsel*

*Bureau v. U.S. Dep't of Def.*, 723 F. Supp. 2d 54, 59 (D.D.C. 2010) ("[E]nlisting a full-time staff of twelve for a year to review hundreds of thousands of unsorted images would impose . . . an undue burden.").

The burden that processing the Free-Text Responses would impose on CDC far exceeds lesser post-search burdens that courts have found unreasonable. *See, e.g.*, *Ctr. for Immigr. Studies*, 628 F. Supp. 3d at 272 (8,151 workhours to process); *Nat'l Day Laborer*, 2017 WL 1494513, at *14-15 (between 436 and 1,300 weeks to review and redact); *Ayuda*, 70 F. Supp. 3d at 275–76 (8,000 workhours to manually review and redact); *Vietnam Veterans of Am.*, 8 F. Supp. 3d at 202–04 (27 work years to review and redact). And it is comparable to other burdens that courts have refused to countenance. *See, e.g.*, *Shapiro*, 525 F. Supp. 3d at 539–40 (193,311 workhours to manually review and redact).

In sum, requiring CDC to review and redact the Free-Text Responses would, by any measure, impose an unreasonable burden on the agency that is beyond what FOIA contemplates. Accordingly, the non-exempt information within these responses is not reasonably segregable. And Doctors for Choice have not shown that the generic public interest outweighs the substantial privacy interests protected by Exemption 6—particularly given the vast data CDC has already made publicly available concerning the V-safe program.

### 3. Plaintiff's arguments that CDC has multiple available options for processing its FOIA request are inaccurate.

In its summary-judgment motion, Plaintiff claims that CDC has alternative options

for processing its FOIA request.  (Doc. 9, at 28–32.)  Despite these assertions, none of these options are actually viable, as they demonstrate a lack of knowledge of the government contract and procurement process, a lack of knowledge of how allocated government funding works, and a lack of knowledge of CDC's existing productions of the information that Doctors for Choice claims to seek, just in another format.

Plaintiff points to an existing contract with an information-technology services company to translate the Free-Text Responses into Medical Dictionary for Regulatory Activities ("MedDRA") terminology, or "codes."  (Doc. 9, at 20; *see also* App. 13 ¶¶ 30–31.)  MedDRA coding facilitates research by converting highly variable language describing things such as a patient's description of symptoms into consistent, universally accepted, and easily ascertainable medical technology, and converting the Free-Text Responses to MedDRA codes ensures the information can be disclosed to both researchers and the public without inadvertently releasing personal identifying information.  (App. 13 ¶¶ 31–32.)  Under this contract, more than 5.1 million Free-Text Response fields have already been converted and made public.  (App. 14 ¶ 33.)  As this contract to convert the Free-Text Responses into MedDRA coding is already ongoing, and much of the Free-Text Responses fields have already been converted (and publicly released) into MedDRA coding, CDC cannot modify the existing contract to add the processing Plaintiff's FOIA request to this contract as Doctors for Choice claims—instead, a new contract would need to be signed and funded to review and redact any PII within the Free-Text Responses.  (App. 14 ¶¶ 34–35.)

Plaintiff also argues that CDC has a large discretionary budget and received a lot

of COVID-19-related funding over the past few years, so it should just use those funds to pay to process Plaintiff's FOIA request, presumably through an outside contractor. (Doc. 9, at 29–30.) But that is not how government funding works. In order for CDC's FOIA Office to request additional funds to use for processing Plaintiff's FOIA request, the request would first need to go through a planning process, with no guarantee that it would be approved or that funds would be available. (App. 14 ¶ 35.) That is particularly true here, where a contract has already been procured to translate the Free-Text Responses into MedDRA coding that can be used by any researcher (*i.e.*, it will be beneficial to more than just Plaintiff). (App. 13–14 ¶¶ 31–35.) The submission process generally takes about a year before the FOIA Office would learn whether funds would be provided. (App. 14 ¶ 35.) If funding is approved, the FOIA Office would then need to initiate a solicitation for bids to contract for this service, as it does not have the resources to process this request in-house. (*Id.*) It generally takes about a year to procure a contract, and then several additional months would be needed to hire and train the contract staff to properly review and redact the Free-Text Responses. (*Id.*) As a result, expending additional money to process Plaintiff's FOIA request would not be a quick-turnaround or simple process, despite what Doctors for Choice seems to think.

Moreover, the process required to review and redact all 7.8 million Free-Text Responses, as explained in detail above, is not as straightforward as Plaintiff claims. (Doc. 9, at 30.) While the Free-Text Responses were not specifically drafted to capture personal identifiable information, V-safe participants did include PII in these fields when answering the questions. (App. 16 ¶ 38.) These participants also included a variety of

types of PII in their responses, making it more difficult to detect through a PII detection service, which require the user to know exactly what type of PII to search for and which are not applicable to all types of PII, especially in a narrative format. (*Id.*) Moreover, even if CDC's FOIA Office could use a PII detection service, those services do not take into account the fact that personal information that is not PII on its own may, when coupled with other personal information in the same narrative, lead to the identity of a person, or that human error when typing information into the response field makes it difficult for a detection service to identify that personal information as PII. (*Id.*) As a result, even if a PII detection service was used, each Free-Text Response field would still require two levels of manual review by a human to ensure all PII is redacted, pursuant to the CDC's FOIA Office procedures—*id.*—as Doctors for Choice acknowledges (*see* Doc. 9, at 28 (acknowledging that the Free-Text Response fields will need to be reviewed for PII, "likely using a mix of automated and manual review")).

CDC also cannot just process the Free-Text Responses in the same way it process the Vaccine Adverse Event Reporting System (VAERS) data, as Plaintiff proposes. (Doc. 9, at 30–31.) VAERS was already operational prior to the COVID-19 pandemic. (App. 15 ¶ 37.) As a result, VAERS data is processed and made publicly available via a separate contract that does not cover V-safe data—and it is also a separate contract from the contract supporting the MedDRA coding of data collected through the V-safe application. (App. 15 ¶¶ 36–37.) Additionally, the information collected in VAERS and V-safe intentionally differs, which would further complicate the use of the same process to produce the data collected from both systems. VAERS is designed to detect and

characterize rare and unexpected conditions, while the V-safe program is designed to evaluate common reactogenicity[4] events and to characterize the basic safety profile of COVID-19 vaccines with respect to these common reactogenicity events.  (App. 15 ¶ 37.) If a V-safe participant indicated that they had received medical care for any of the symptoms reported, the V-safe Call Center contacted them to assist with reporting that information into VAERS as applicable.  (*Id.*)  Indeed, the VAERS reporting was specifically designed to solicit these additional details relevant to the assessment of an adverse event.  (*Id.*)  Thus, CDC cannot simply start processing the Free-Text Responses using the contract to review and publicly release the VAERS data.

* * *

The data files with the Free-Text Responses contain information that is exempt from disclosure pursuant to Exemption 6.  The non-exempt portions of the Free-Text Responses cannot be reasonably segregated.  And Plaintiff's assertions regarding the CDC's production options clash with the basic realities of government procurement requirements and the necessary PII redaction process.  The Court should therefore grant Defendants summary judgment regarding the propriety of CDC's withholding of the Free-Text Responses in full pursuant to Exemption 6, and deny Plaintiff's summary-judgment motion as to its claim that CDC has improperly withheld responsive records.

---

[4] "Reactogenicity" represents the physical manifestation of the inflammatory response to vaccination, and can include injection-site pain or redness as well as systemic symptoms like fever or headache.  *See* Hervé, Caroline, *et al*., *The how's and what's of vaccine reactogenicity*, NPJ Vaccines (Sept. 24, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6760227/.

C.   **Plaintiff's remaining claims fail, and Defendants are entitled to summary judgment in their favor as to both claims.**

Doctors for Choice also asserts two other claims in its summary-judgment motion: (1) that CDC and HHS did not timely respond to its administrative appeals of the fee-waiver denial and CDC's final determination on the FOIA request, and (2) that CDC improperly denied Plaintiff's fee waiver. (Doc. 9, at 26–27, 32.) But both claims fail, as described below, and Defendants are entitled to summary judgment as to each.

1.   **Plaintiff is not entitled to any relief regarding its claims that Defendants failed to timely respond to its administrative appeals.**

Doctors for Choice alleges that Defendants have never responded to either of Plaintiff's administrative appeals of CDC's decisions to deny its fee waiver and to withhold records, thus violating the 30-day response deadline. (Doc. 9, at 26–27 (citing 5 U.S.C. §§ 552(a)(6)(A)(ii), (B)(i).)

First, that is factually inaccurate. Defendants had already responded to both administrative appeals *before* Plaintiff filed its summary-judgment motion. (App. 3 ¶¶ 8–9.) Defendants responded to the appeal of the fee-waiver denial just eight business days after it was filed. (App. 3 ¶ 9 (explaining that Plaintiff filed this appeal on March 31, 2023, and the HHS Office of the Secretary's Freedom of Information Act Office issued a decision on April 12, 2023), and at 150.) This letter was also re-sent on July 3, 2023— more than a week before Plaintiff filed its motion—to ensure Plaintiff received the decision on the fee waiver appeal. (App. 3 ¶ 9, and at 154.) As for the appeal of CDC's final determination, Defendants sent Plaintiff its response on July 5, 2023—again, before Plaintiff filed for summary judgment on July 11, 2023. (App. 3 ¶ 8, and at 52.) Thus,

Defendants had responded to both of Plaintiff's administrative appeals before Doctors for Choice filed for summary judgment, and its statements to the contrary in its motion are inherently wrong.

Second, this claim is moot. While Defendants did timely respond to Plaintiff's administrative appeal of the fee-waiver denial, Doctors for Choice is correct that Defendants' decision on the appeal of CDC's final determination was not issued within 30 days. However, as the Fifth Circuit has explained, a FOIA requestor's untimeliness claim is mooted by the agency's belated response to the request. *Velasquez v. Nielsen*, 754 F. App'x 256, 262 (5th Cir. 2018); *see also Voinche v. FBI*, 999 F.2d 962, 963 (5th Cir. 1993) (same); *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) ("[H]owever fitful or delayed the release of information under the FOIA may be . . . if we are convinced [the agency has], however belatedly, released all nonexempt material, we have no further judicial function to perform under the FOIA").

Moreover, no further relief is available to Plaintiff for this alleged violation of the FOIA. Before a FOIA requestor can file suit in federal district court, it must "ordinarily exhaust administrative remedies by appealing an issue through the FOIA administrative process following an initial adverse determination by the agency." *Coleman v. DEA*, 714 F.3d 816, 820 (4th Cir. 2013) (citing *Wilbur*, 355 F.3d at 676). However, if an agency has not complied within the statutory time limits of a FOIA request or appeal, the requestor is deemed to have exhausted his administrative remedies and may bring suit. *See* 5 U.S.C. § 552(a)(6)(C); *Voinche*, 999 F.2d at 963. In short, if the agency does not adhere to the FOIA's timelines, "the 'penalty' is that the agency cannot rely on the

administrative exhaustion requirement to keep cases from getting into court." *Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180, 189 (D.C. Cir. 2013). This so-called penalty "provides an incentive for agencies to move quickly but recognizes that agencies may not always be able to adhere to the timelines that trigger the exhaustion requirement." *Id.*

However, even if an agency does not timely respond to a FOIA request or appeal, these "untimely responses, in and of themselves, do not entitle [the requestor] to judgment in her favor." *Hainey*, 925 F. Supp. 2d at 42 (collecting cases). Instead, courts have repeatedly held "that untimeliness is not a *per se* statutory violation entitling the requestor to any specific remedy, but rather that untimeliness entitles the requestor to seek a remedy in the form of judicial relief." *Navigators Ins. Co. v. Dep't of Justice*, 155 F. Supp. 3d 157, 167 (D. Conn. 2016) (internal citations omitted) (collecting cases).

That same distinction applies here. Plaintiff has filed suit regarding Defendants' determination on its FOIA request. Defendants have not asserted that Doctors for Choice failed to exhaust its administrative remedies. And Defendants have now responded to both of Plaintiff's administrative appeals (indeed, even before Doctors for Choice filed for summary judgment). Thus, at most, Defendants' failure to respond to Plaintiff's administrative appeal of CDC's final determination simply means that Doctors for Choice has constructively exhausted its administrative remedies—no more, and no less. It is not clear what other relief Plaintiff could obtain for this asserted violation of FOIA.

### 2. CDC properly denied Plaintiff's request for a fee waiver.

Plaintiff also claims that CDC improperly denied its request for a public-interest

fee waiver.  (Doc. 9, at 32 (citing 5 U.S.C. § 552(a)(4)(A)(iii).)  However, as Doctors for Choice provided only vague, general statements in its request as to why it deserved a fee waiver, it failed to meet its burden to demonstrate to CDC that it was entitled to this request.  (App. 17–18 ¶¶ 39–41, and at 20–25.)

To offset the costs of fulfilling document requests, FOIA authorizes agencies to collect three types of processing fees: (1) search fees to cover the cost of agency personnel time spent locating the requested documents, (2) review fees to cover the cost of personnel time spent determining whether any requested documents are exempt from disclosures, and (3) duplication fees to cover the costs of actual duplication of the records as well as any personnel time spent in the duplication process.  *Coleman*, 714 F.3d at 819; *see also* 5 U.S.C. § 552(a)(4)(A).  However, these fees may be waived under a public-interest fee waiver if the requestor shows two things: first, "that disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government," and second, that disclosure "is not primarily in the commercial interest of the requestor."  *Voinche v. U.S. Dep't of Air Force*, 983 F.2d 667, 668 n.3 (5th Cir. 1993) (quoting 5 U.S.C. § 552(a)(4)(A)(iii)).

The fee waiver requestor bears the burden of proving an entitlement to a fee waiver.  *Id.* at 668 n.2.  And if the requestor files suit on a fee-waiver denial, while the court reviews a challenge to the denial of a fee waiver de novo, it is limited to the record before the agency.  *AFGE*, 907 F.2d at 209 (citing 5 U.S.C. § 552(a)(4)(A)(vii)).

The fact that the subject matter at issue in the FOIA request is of public interest is

not sufficient to demonstrate entitlement to the public-interest fee waiver. *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988). Instead, an "agency may infer a lack of substantial public interest when a public interest is asserted but not identified with reasonable specificity, and circumstances do not clarify the point of the requests." *Id.* (cleaned up). "Conclusory statements on their face are insufficient." *McQueen v. United States*, 264 F. Supp. 2d 502, 525 (S.D. Tex. 2003); *see also Nat'l Sec. Counselors v. U.S. Dep't of Justice*, 848 F.3d 467, 473 (D.C. Cir. 2017) (explaining a requestor "must justify their entitlement to a waiver of fees in 'reasonably specific' and 'non-conclusory' terms").

Applying the public-interest fee-waiver criteria requires "assessment along two dimensions: the degree to which 'understanding' of government activities will be advanced by seeing the information; and the extent of the 'public' that the information is likely to reach." *Cause of Action v. FTC*, 799 F.3d 1108, 1116 (D.C. Cir. 2015). Therefore, a requestor seeking a public-interest fee waiver must at least show that it can "disseminate the disclosed records to a reasonably broad audience of persons interested in the subject." *Id.* (citing *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 815 (2d Cir. 1994)).

In a recent case decided by the D.C. Circuit, the court affirmed the denial of a public-interest fee waiver where the non-profit organization requestor "failed to provide adequate information suggesting that it would effectively disseminate its requested information in furtherance of the public's understanding of government operations." *Nat'l Sec. Counselors*, 848 F.3d at 473–74. The organization's website "appeared to be no more than a clearing house for the records it received through FOIA." *Id.* at 474

(cleaned up).  The organization "did not appear to be actively engaged in gathering information to produce original publications," nor did the organization produce any "information about the size of its audience or the amount of traffic received by its website."  *Id.*  The organization's own plans for how it would use the "tens of thousands of pages of records encompassed by its request indicated only that it hoped to perform 'unbiased analyses,' 'develop a predictive model,' 'or at least write a white paper.'"  *Id.* But the organization "neither identified a discernible audience for the disclosures in their raw form" nor demonstrated that it possessed "the requisite scientific or technical sophistication to analyze and convey the data in a more broadly digestible form."  *Id.* Therefore, the court determined that the fee waiver was properly denied, as the requestor "failed to provide sufficiently specific and non-conclusory statements" that demonstrated it was able "to disseminate the disclosures to a reasonably broad audience of persons interested in the subject."  *Id.* (quoting *Cause of Action*, 799 F.3d at 1116).

Just like the requestor in *National Security Counselors*, Doctors for Choice provided almost no information in its request to demonstrate it was entitled to a fee waiver.  (*See* App. 20–25.)  It wrote one paragraph quoting the public-interest fee waiver FOIA provision, and stating that the disclosure of the information would benefit the public by providing primary source documentation of COVID-19 vaccine reactions, by "shed[ding] light on the overall safety and efficiency of the COVID-19 vaccines," and by "shed[ding] light on whether CDC and other health agencies appropriately monitored and acted upon the information" provided by V-safe participants.  (*Id.*)  It later explained (for other purposes) that it was primarily engaged in disseminating information to the public

and "pledge[d] that all data" obtained from the FOIA request would "be made available on its website," drsforchoice.org.  (*Id.*)

But the fact that the information requested was of public interest did not make Doctors for Choice automatically eligible for a public-interest fee waiver.  *See Larson*, 814 F.2d at 1483.  And Plaintiff provided almost no insight that it would disseminate the requested records to a "reasonably broad audience of persons interested in the subject." *Cause of Action*, 799 F.3d at 1116.  "That deficiency alone is a sufficient basis for denying the fee waiver request."  *Nat'l Sec. Counselors*, 848 F.3d at 474 (quoting *Larson*, 814 F.2d at 1483).  Thus, CDC properly determined that Plaintiff's request for a fee waiver should be denied, as Doctors for Choice failed to provide any evidence to warrant the grant of a fee waiver, and Defendants are entitled to summary judgment on this claim.[5]  (App. 17 ¶¶ 39–40.)

## V.       Conclusion

In sum, it is undisputed that the CDC adequately searched its records for information responsive to Doctors for Choice's FOIA request and that the information sought implicates the substantial privacy interests of third-party individuals.  The only dispute is whether Doctors for Choice has established the asserted public interest outweighs these acknowledged substantial privacy interests.  Applying this balancing

---

[5] Even though Plaintiff was not entitled to a fee waiver, Doctors for Choice was determined to be entitled to two hours of free search time, up to 100 pages of duplication without charge, and no charge for any review time of those pages.  (App. 18 ¶ 41.)  As a result, no fees were assessed against Plaintiff as CDC's search took less than two hours and the information released to Doctors for Choice had already been reviewed and made public.  (*Id.*)

test, CDC has credibly averred that—within the Free-Text Responses—private information cannot be reasonably segregated from non-exempt information.  And the burden of countless hours to manually review 7.8 million entries to redact private information far exceeds that which other federal courts have held to be unreasonable. For all these reasons, the Court should grant summary judgment in Defendants' favor, deny Plaintiff's motion for summary judgment, and enter final judgment in Defendants' favor dismissing Plaintiff's claims against Defendants with prejudice.

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

*/s/ Sarah E. Delaney*
Sarah E. Delaney
Assistant United States Attorney
Arizona Bar No. 031722
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8730
Facsimile:    214-659-8807
sarah.delaney@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

On November 24, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Sarah E. Delaney*
Sarah E. Delaney
Assistant United States Attorney
